JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
See Attached

## DEFENDANTS
See Attached

CLERK, U.S DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**(b)** County of Residence of First Listed Plaintiff   Dallas
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed
(IN U.S. PLAINTIFF CASES ONLY)
NOTE  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
See Attached

Attorneys (If Known)
See Attached

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

x 2  U.S. Government
Defendant

x 4  Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                          and One Box for Defendant)

| | PLF | DEF | | PLF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | x 1 | ☐1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | x 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | x 365 Personal Injury— | of Property 21 USC | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 820 Copyrights | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 830 Patent | ☐ 850 Securities/Commodities/ |
| (Excl  Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | ☐ 840 Trademark | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | | | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | | ☐ 870 Taxes (U.S. Plaintiff | Under Equal Access to |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | or Defendant) | Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. | 26 USC 7609 | State Statutes |
| | | ☐ 550 Civil Rights | Security Act | | ☐ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

☐ 1  Original
Proceeding

x 2  Removed from
State Court

☐ 3  Remanded from
Appellate Court

☐ 4  Reinstated or
Reopened

☐ 5  Transferred from
another district
(specify)

☐ 6  Multidistrict
Litigation

☐ 7  Appeal to
District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)

28 U S C  Section 1332 (Diversity of citizenship between citizens of different states, where matter in controversy exceeds $75,000); removal from state court as permitted by 28 U.S.C. Section 1446.

## VII. REQUESTED IN
COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   x Yes   ☐ No

## VIII. RELATED CASE(S)
IF ANY
(See instructions):

JUDGE

DOCKET NUMBER

DATE  9/29/03

SIGNATURE OF ATTORNEY OF RECORD
David S. Lee

FOR OFFICE USE ONLY

RECEIPT #             AMOUN             APPLYING IFP             JUDGE             MAG JUDGE

## LIST OF PARTIES AND ATTORNEYS

**I. (a)  Plaintiffs**

Lisa A. Davis, Betty J. Glidewell, Sheryl D. Jones, and Sally E. Palmer

**Defendants**

Wyeth, Dr. Geoffrey Jubang, Dr. James D. Hale, and Dr. George Cole

**I. (c)  LIST OF ATTORNEYS**

**ATTORNEYS FOR PLAINTIFFS**

George M. Fleming
James L. Doyle, II
Scott A. Love
FLEMING & ASSOCIATES, L.L.P.
1330 Post Oak Boulevard, Suite 3030
Houston, Texas 77056
713-621-7944

Mike O'Brien
MIKE O'BRIEN, P.C.
1330 Post Oak Boulevard., Suite 2960
Houston, Texas  77056
713-222-0088

**ATTORNEYS FOR DEFENDANT WYETH**

Kenneth J. Ferguson
Attorney in Charge
State Bar No. 06918100
Leslie A. Benitez
State Bar No. 02134300
Susan E. Burnett
State Bar No. 20648050
David Lill
State Bar No. 12352500
**CLARK, THOMAS & WINTERS,**
**A PROFESSIONAL CORPORATION**
P.O. Box 1148
Austin, Texas 78767
(512) 472-8800
(512) 474-1129 (Fax)

**VINSON & ELKINS L.L.P.**
William D. Sims, Jr.
State Bar No. 18429500
Dale Markland
State Bar No. 12988500
3700 Trammell Crow Center
2001 Ross Ave.
Dallas, Texas  75201-2975
(214) 220-7700
(214) 220-7716 [Fax]

<u>**ATTORNEYS FOR ALL OTHER DEFENDANTS**</u>

Unknown at this time.



## United States District Court
## Northern District of Texas
## Dallas Division

### Supplemental Civil Cover Sheet for Cases Removed
### From State Court

**This form must be attached to the Civil Cover Sheet at the time the case is filed in the U.S. District Clerk's Office. Additional sheets may be used as necessary.**

1.    **State Court Information:**

Please identify the court from which the case is being removed and specify the number assigned to the case in that court.

<u>Court</u>                                                                 <u>Case Number</u>

192nd Judicial District Court of Dallas County, Texas        03-5278

2.    **Style of Case:**

Please include all Plaintiff(s), Defendant(s), Intervenor(s), Counterclaimant(s), Crossclaimant(s) and Third Party Claimant(s) still remaining in the case and indicate their party type. Also, please list the attorney(s) of record for each party named and include their bar number, firm name, correct mailing address, and phone number (including area code.)

Cause No. 03-5278; *Lisa A. Davis, Betty J. Glidewell, Sheryl D. Jones, and Sally E. Palmer v. Wyeth, Dr. Geoffrey Jubang, Dr. James D. Hale, and Dr. George Cole,* In the 192nd Judicial District Court of Dallas County, Texas



| Party and Party Type | Attorney(s) |
|---|---|
| **PLAINTIFFS**<br><br>Lisa A. Davis, Betty J. Glidewell, Sheryl D. Jones, and Sally E. Palmer | George M. Fleming<br>State Bar No. 07123000<br>James L. Doyle, II<br>State Bar No. 06094450<br>Scott A. Love<br>State Bar No. 24002495<br>**FLEMING & ASSOCIATES, L.L.P.**<br>1330 Post Oak Boulevard, Suite 3030<br>Houston, Texas 77056<br>713-621-7944 (Tel)<br><br>and<br><br>Mike O'Brien<br>State Bar No. 15170200<br>**MIKE O'BRIEN, P.C.**<br>1330 Post Oak Boulevard., Suite 2960<br>Houston, Texas 77056<br>713-222-0088 (Tel) |
| **DEFENDANTS**<br><br>Wyeth | Kenneth J. Ferguson<br>State Bar No. 06918100<br>Leslie A. Benitez<br>State Bar No. 02134300<br>Susan Burnett<br>State Bar No. 20648050<br>David Lill<br>State Bar No. 12352500<br>**CLARK, THOMAS & WINTERS**<br>**A Professional Corporation**<br>P.O. Box 1148<br>Austin, Texas 78767<br>512-472-8800<br>512-474-1129 (Fax)<br><br>William D. Sims, Jr.<br>State Bar No. 18429500<br>Dale Markland<br>State Bar No. 12988500<br>**VINSON & ELKINS L.L.P.**<br>3700 Trammell Crow Center<br>2001 Ross Ave.<br>Dallas, Texas 75201-2975<br>(214) 220-7700<br>(214) 220-7716 [Fax] |

| All Other Defendants | Unknown at this time |
|---|---|

3. **Jury Demand:**

Was a Jury Demand made in State Court?   __X__  Yes      ___  No

If *"Yes,"* by which party and on what date?

Party                                              Date

Plaintiffs                                         May 29, 2003

Defendant Wyeth                                    September 25, 2003

4. **Answer:**

Was an Answer made in State Court?   __X__  Yes      ___  No

If *"Yes,"* by which party and on what date?

**Party**                                          **Date**

Defendant Wyeth                                    September 25, 2003

5. **Unserved Parties:**

The following parties have not been served at the time this case was removed:

**Party**                                          **Reason(s) for No Service**

Wyeth has no knowledge at this time of the status of service of other parties.

6. **Nonsuited, Dismissed or Terminated Parties:**

Please indicate any changes from the style on the State Court papers and the reason for that change:

**Party**                                          **Date**

N/A

7. **Claims of the Parties:**

The filing party submits the following summary of the remaining claims of each party in this litigation:

**Party**                                                  **Date**

N/A

Date: _9/29/03_                     _David S. Liu_____
                                    Signature of Attorney


ORIGINAL

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

LISA A. DAVIS, BETTY J. §
GLIDEWELL, SHERYL D. JONES, §
AND SALLY E. PALMER, §
 §    CIVIL ACTION NO. _____
**Plaintiff,** §
 §
v. §
 §
**WYETH and** §
**DR. GEOFFREY JUBANG, DR. JAMES** §
**D. HALE, AND DR. GEORGE COLE,** §
 §
**Defendants.** §

JURY REQUESTED
NORTHERN DISTRICT OF TEXAS
**FILED**

SEP 3 0 2003

CLERK, U.S. DISTRICT COURT
By _____
        Deputy

## DEFENDANT WYETH'S NOTICE OF REMOVAL

TO:    The United States District Court for the Northern District of Texas, Dallas Division.

NOW COMES Wyeth, Defendant in the above-styled cause, and files this Notice of Removal of said cause to the United States District Court for the Northern District of Texas, Dallas Division, and would respectfully show the Court as follows:

### I.
### Introduction

On May 29, 2003, Plaintiffs Lisa A. Davis, Betty J. Glidewell, Sheryl D. Jones, and Sally E. Palmer, filed suit against Wyeth in the 192nd Judicial District of Dallas County, Texas, Cause No. 03-05278. Plaintiffs also named as defendants in this action Dr. Geoffrey Jubang, Dr. James D. Hale, and Dr. George Cole. Copies of all process, pleadings and orders filed in the state court are attached hereto.

Claims involving the diet drugs Pondimin and Redux (distributed by Wyeth) were consolidated in multi-district litigation proceedings in the United States District Court for the Eastern District of Pennsylvania (the "MDL Court"). *In re: Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability Litigation*, MDL No. 1203. In August 2000,

the MDL Court approved a nationwide class action settlement (the "Settlement Agreement"), which included Plaintiff's claims. *See Brown v. American Home Products Corporation, In re: Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability*, 2000 WL 1222042 (E.D. Pa. Aug. 20, 2000). The Settlement Agreement provides an extensive array of benefits to class members and several "opt-out" provisions. Certain members of the nationwide settlement class can exercise a so-called "Intermediate Opt-Out" right to pursue claims in court, subject to certain limitations prescribed in the Settlement Agreement. Plaintiffs purport to meet the requirements for an Intermediate Opt-Out and have filed Plaintiffs' underlying lawsuit in Texas state court.

This action is one in which this Court has original subject matter jurisdiction under the provisions of 28 U.S.C. § 1332, and is one which may be removed to this Court by Wyeth pursuant to the provisions of 28 U.S.C. § 1441(b), in that, excluding the fraudulently joined defendant, it is a civil action between citizens of different states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

## II.

### Diversity of Citizenship

Plaintiffs are citizens of the State of Texas.

Wyeth is a Delaware Corporation with its principal place of business in New Jersey.

Dr. Geoffrey Jubang, Dr. James D. Hale, and Dr. George Cole are Texas citizens; however, Drs. Jubang, Hale and Cole are fraudulently joined and thus their citizenship may be disregarded. A non-diverse defendant is deemed to be fraudulently joined, and thus may be disregarded for purposes of determining diversity jurisdiction, when there is no reasonable possibility that the plaintiff can establish a cause of action against the non-diverse party under state law. *Badon v. RJR Nabisco Inc.*, 236 F.3d 282 (5th Cir. 2000). There is no reasonable

possibility that Plaintiffs can establish a cause of action against Drs. Jubang, Hale and Cole in this case.

### A.   DRS. JUBANG, HALE AND COLE ARE FRAUDULENTLY JOINED BECAUSE THERE IS NO REASONABLE POSSIBILITY THAT PLAINTIFFS CAN ESTABLISH A CLAIM AGAINST DRS. JUBANG, HALE AND COLE

Although the standard for fraudulent joinder is a heavy one, it was not meant to sanction plaintiffs' attempts to disallow federal jurisdiction in any and all cases. *See Wecker v. Nat'l Enameling & Stamping Co.*, 204 U.S. 176, 186 (1907) ("The Federal courts should not sanction devices intended to prevent a removal to a Federal court where one has that right."); *see also McKinney v. Bd. Of Md. Cmty. College*, 955 F.2d 924, 928 (4th Cir. 1992) ("Congress created the removal process to protect defendants. It did not extend such protection with one hand, and with the other give plaintiffs a bag of tricks to overcome it."). The fraudulent joinder standard in this Circuit requires a party claiming fraudulent joinder to show that there is no reasonable possibility the plaintiff could establish her claim. The Fifth Circuit has held that a mere hypothetical possibility of recovery is insufficient:

> Plaintiffs appear to argue that *any mere theoretical possibility* of recovery—no matter how remote or fanciful—suffices to preclude removal. We reject this contention. As the cited authorities reflect, there must at least be a reasonable basis for predicting that state law would allow recovery in order to preclude a finding of fraudulent joinder.

*Badon v. RJR Nabisco Inc.*, 236 F.3d 282, 286 n.4 (5th Cir. 2000) (*Badon II*) (emphasis in original); *see also Griggs v. State Farm Lloyds*, 181 F.3d 694, 701 (5th Cir. 1999) ("[W]e must determine whether there is any *reasonable* basis for predicting that Griggs might be able to establish Blum's liability on the pleaded claims in state court. . . .") (emphasis in original). One of the Fifth Circuit's most recent fraudulent joinder cases confirms that a removing defendant

need only show that there is no "reasonable possibility" the plaintiff can state a claim against the fraudulently joined defendant. *Travis v. Irby*, 326 F.3d 644, 648 (5th Cir. 2003).[1]

Merely pleading a cause of action against a party is insufficient to show that the plaintiff has a reasonable possibility of recovery against that party. The Court is authorized to look beyond the pleadings and engage in a summary judgment-type inquiry to determine whether fraudulent joinder exists. *Badon*, 224 F.3d at 389-90 ("[W]e have consistently recognized that diversity removal may be based on evidence outside the pleadings."); *Burden v. General Dynamics Corp.*, 60 F.3d 213, 217 n.18 (5th Cir. 1995) (collecting cases that authorize court to look beyond pleadings).

## B.  PLAINTIFFS' CLAIMS AGAINST DRS. JUBANG, HALE AND COLE ARE BARRED BY THE STATUTE OF LIMITATIONS

A defendant is deemed fraudulently joined when the plaintiff's claim against that defendant is barred by the applicable statute of limitations. *See Ross v. Citifinancial,* No. 02-60608, slip. op. at 8-10 (5th Cir. Aug. 29, 2003); *Bain ex. rel. Bain*, 167 F. Supp. 2d 932, 937 (E.D. Tex. 2001); *Alter v. Bell Helicopter*, 944 F. Supp. at 531, 541 (S.D. Tex. 1996). In        this case, Plaintiffs' claims against Drs. Jubang, Hale and Cole are barred by the applicable two-year statute of limitations:

> Notwithstanding any other law, no health care liability claim may be commenced unless the action is filed *within two years* from the occurrence of the breach or tort or from the date the medical or health care treatment that is the subject of the claim or hospitalization for which the claim is made is completed.

TEX. REV. CIV. STAT. ART. 4590i, § 10.01 (emphasis added). This statute imposes an absolute two-year limitations bar, subject only to an "Open Courts" exception which is not applicable here for the reasons set out below. Plaintiffs' claims against Drs. Jubang, Hale and Cole are

---

[1] *Travis* makes clear that the "no possibility" standard of *Heritage Bank v. Redcom Laboratories, Inc.*, 250 F.3d 319, 323 (5th Cir. 2001) and other cases contains an implicit requirement of reasonableness—*i.e.*, that standard means that a remote, or speculative or hypothetical possibility of recovery is not enough.

4

based upon Drs. Jubang, Hale and Cole's prescription of the diet drugs to Plaintiffs. The drugs, however, were withdrawn from the market in September, 1997, so Drs. Jubang, Hale and Cole could not have prescribed them after that date. Thus, the statute of limitations started running, at the latest, in September, 1997 and expired in September, 1999. Plaintiffs did not file suit until May, 2003, over five years after the latest date Drs. Jubang, Hale or Cole could have prescribed the drugs, and over three years after the statute of limitations expired.

Plaintiffs argue that Drs. Jubang, Hale and Cole cannot assert a statute of limitations defense because of the discovery rule, the Open Courts doctrine and Drs. Jubang, Hale and Cole's alleged fraudulent concealment. As set forth below, these bald assertions do not allow Plaintiffs to circumvent the two-year limitations period imposed by Article 4590i.

**1.     The Discovery Rule Does Not Apply to Plaintiffs' Claims.**

Plaintiffs attempt to avoid the applicable limitations period in this case by claiming that the discovery rule applies to Plaintiffs' medical negligence claims. Petition, ¶ 67. Plaintiffs fail to allege any facts regarding why their alleged condition was not and could not have been discovered more than two years before Plaintiffs filed suit. Moreover, and most importantly, the discovery rule does not apply to the limitations period on medical negligence claims. Section 10.01 of Article 4590i "imposes an absolute two-year statute of limitations regardless of when an injured party learns of the injuries." *Jennings v. Burgess*, 917 S.W.2d 790, 793 (Tex. 1996). Further, when a claim against a physician is based on the physician's prescribing a drug, limitations runs from the date of last drug treatment. *See Rowntree v. Hunsucker*, 833 S.W.2d 103, 105 (Tex. 1992). Pondimin and Redux were withdrawn from the market in September of 1997, and Drs. Jubang, Hale and Cole could not have prescribed them after that date. Thus, the statute of limitations on Plaintiffs' claims began to run no later than September, 1997. The limitations period expired no later than September, 1999, more than three years ago.

**2.     The Doctrine of Fraudulent Concealment Does Not Apply to
         Plaintiffs' Claims.**

Fraudulent concealment is not a cause of action per se, but is an equitable doctrine that, in the proper case, estops a defendant from relying on the statute of limitations. *Bordelon v. Peck*, 661 S.W.2d 907, 908 (Tex. 1983). "[P]roof of fraudulent concealment requires more than evidence that the physician failed to use ordinary care; *it also requires evidence that the defendant actually knew the plaintiff was in fact wronged, and concealed that fact to deceive the plaintiff.*" *Earle v. Ratliff*, 998 S.W.2d 882, 888 (Tex. 1999) (emphasis added). *See also Shah v. Moss*, 67 S.W.3d 836, 841 (Tex. 2001) (elements of fraudulent concealment are that healthcare provider 1) actually knew wrong occurred, 2) had fixed purpose to conceal wrong from plaintiff, and 3) did, in fact, conceal wrong from plaintiff). Plaintiffs allege that Drs. Jubang, Hale and Cole fraudulently concealed from Plaintiffs "the dangers of Pondimin and Redux." Petition, ¶ 78. Plaintiffs also allege that Drs. Jubang, Hale and Cole failed to advise Plaintiffs to undergo an echocardiogram and cardiovascular exam. Petition, ¶ 75. These allegations fail to plead the necessary elements for fraudulent concealment.

Plaintiffs do not allege that Drs. Jubang, Hale and Cole knew that Plaintiffs were injured from diet drugs, or that the physician intended to, or in fact, concealed any information in order to deceive. In a recent opinion from the United States District Court for the Middle District of Tennessee, Nashville Division, U.S. District Judge Aleta A. Tauger held that the physician's failure to advise the plaintiff to undergo testing or evaluation did not establish fraudulent concealment. *Constant v. Wyeth, et al.*, Cause No. 3:03-0052, April 9, 2003, at 6, attached as Exhibit 1. The district court stated:

> If there was no way for Dr. Johnson to know that, in fact, the plaintiff had been injured by taking the drugs, there was no way for him to have misled, or concealed that fact from, that plaintiff, and his remaining silent is of no significance.

6

*Id.*

The MDL Court has held, even more recently, that allegations of mere negligence do not establish fraudulent concealment. *See* Memorandum and Pretrial Order No. 2876 entered May 29, 2003 in *In Re: Diet Drugs*, MDL Docket No. 1203, pp. 11-12, attached as Exhibit B. Judge Bartle held that the plaintiffs' claims against three non-diverse Utah physicians (which were filed more than one year before Plaintiff here filed her claim) were barred by Utah's statute of repose (which gave the plaintiffs four years to file suit, or twice as long as article 4590i). Although Utah's statute of repose contains an exception for fraudulent concealment, that exception was not invoked, Judge Bartle held, by the plaintiffs' allegations that the physicians failed to inform them of the "extent of the dangers and risks and hazards associated with these products" and failed "to provide truthful, accurate, timely, and adequate instructions and warnings." *Id. Cf. Earle*, 998 S.W.2d at 888 (under Texas law, fraudulent concealment requires more than failure to use ordinary care). Judge Bartle concluded there was "no reasonable basis in fact or colorable ground supporting the claim against" the physicians, and denied plaintiffs' motion to remand. In sum, Plaintiff's own pleadings in this case demonstrate that the doctrine of fraudulent concealment does not apply to Plaintiffs' claims against Drs. Jubang, Hale and Cole.[2]

### 3. The Open Courts Exception to Article 4590i Does Not Apply to Plaintiffs' Claims.

Plaintiffs' argument that the Open Courts exception allow Plaintiffs to avoid the limitations period prescribed by Art. 4590(i) is unavailing. Under the Open Courts doctrine, "it is incumbent on the party seeking to avoid limitations to plead facts" showing it was "impossible" for Plaintiffs to have discovered the cause of action within two years. *Rubalcaba v.*

---

[2]  In any event, fraudulent concealment only operates to toll limitations until the plaintiff discovers, or should have discovered, the alleged fraud. *See Santanna Nat. Gas Corp. v. Hamon Operating Co.*, 954 S.W.2d 885, 891 (Tex. App.—Austin 1997, writ denied); *Constant v. Wyeth, et al.*, Cause No. 3:03-0052, April 9, 2003, at 6, attached as Exhibit 1. As set forth in this Notice, that date was 1997. *See, infra*, Section II.C.2.

*Kaestner*, 981 S.W.2d 369, 373 (Tex. App.—Houston [1st Dist.] 1998, pet. denied). *See also O'Reilly v. Wiseman*, 107 S.W. 3d 699, 707 (Tex. App.—Austin 2003, pet. denied) ("It is the plaintiff's burden to show that the nature of the claim was impossible or exceedingly difficult to discover and that she did not or could not have learned of the fact or injury within the two-year period."), attached as Exhibit 2.  Only if the Plaintiffs meet that burden may the court then "determine whether this restriction on the plaintiff's right to redress is reasonable when weighed against the bases and purposes of the statute." *Id.*

Plaintiffs have pled no facts to support the Open Courts argument.  Heart valve regurgitation is detectable by a simple, non-invasive procedure called an echocardiogram. Plaintiffs have attached to Plaintiffs' Petition echocardiogram readings purportedly performed on dates ranging from March 9, 2002 to November 23, 2002.  As discussed below, however, Plaintiffs were put on notice of the need for such a test in the fall of 1997 by the massive publicity surrounding the withdrawal of Pondimin and Redux.  Plaintiffs give no explanation for ignoring the extensive publicity starting in 1997 that warned of the need for an echocardiogram *in former diet drug users who had no symptom*s and also warned that diet-drug induced heart valve injuries were often *asymptomatic*.  Plaintiffs have failed to plead facts showing that such discovery was *impossible or exceedingly difficult*, as is required to rely on the Open Courts exception to Article 4590i.

Regardless of whether the widespread publicity discussed below put Plaintiffs on inquiry notice, they cannot rely on the Open Courts provision for the additional reason that they waited an unreasonable time after receiving actual notice of their alleged injury to file suit.

4.     **Even if Fraudulent Concealment and the Open Courts Exception Applied, Plaintiffs' Claims Are Still Barred by Limitations**.

Even if the doctrine of fraudulent concealment and the Open Courts exception did apply, Plaintiffs' claims are still barred by limitations. The doctrine of fraudulent concealment tolls limitations only until a plaintiff learns of the cause of action, or, through exercise of reasonable diligence, should have learned of the cause of action. *See Shah*, 67 S.W.3d at 841; *Wilson v. Rudd*, 814 S.W.2d 818 (Tex. App.—Houston [14th Dist.] 1991, writ denied) (citing *Nichols v. Smith*, 507 S.W.2d 518, 519 (Tex. 1974) ("When fraudulent concealment is shown, the statute of limitations is tolled until the right of action is discovered or should have been discovered.")). The estoppel effect ceases when a party learns of "*facts, conditions, or circumstances* which would cause a reasonably prudent person to make inquiry, which, if pursued, would lead to discovery of the concealed cause of action. *Knowledge of such facts is in law equivalent to knowledge of the cause of action*." *Bordelon*, 661 S.W.2d at 909 (citations omitted) (emphasis added). Similarly, the Open Courts exception operates to toll limitations only until a plaintiff knew or should have known of facts that would lead to the discovery of the cause of action. *See Helman v. Mateo*, 772 S.W.2d 64, 66 (Tex. 1989).

"A plaintiff is charged with knowledge of information that has been made public through the media." *Winters v. Diamond Shamrock Chemical Co.*, 941 F. Supp. 617, 622 (E.D. Tex. 1996), *aff'd*, 149 F.3d 387 (5th Cir. 1998), *cert. denied*, 526 U.S. 1034 (1999). As set out below, a reasonably diligent plaintiff would have been aware by the end of 1997 of publicity linking diet drugs to heart valve problems, would have obtained a diagnostic test, and, if in fact she suffered any injury, would have discovered it at that time. Following the September, 1997 withdrawal of Pondimin and Redux, the national as well as the local media inundated the public with information regarding the withdrawal itself as well as the potential cardiac risks associated with

9

those drugs. This same information conveyed by the media repeatedly urged diet drug users to consult their physicians regarding these medications and their potential risks.

*Winters* involved a suit brought by a former nurse based on her alleged exposure to Agent Orange in Vietnam. Judge Cobb of the Eastern District of Texas, Beaumont Division, granted defendants' motion for summary judgment based on their statute of limitations defenses. Judge Cobb noted that the plaintiff should have been aware of the possible health effects of Agent Orange exposure because she "was charged with this knowledge due to extensive publicity" about these effects. *Winters*, 941 F. Supp. at 622. The district court examined the publicity regarding Agent Orange and the class action settlement of these claims and determined that the plaintiff should have been aware of the facts extensively covered by the media. *Id.* The Fifth Circuit recognized that under the Texas discovery rule the statute of limitations is tolled until the plaintiff discovers, or through the exercise of reasonable care and diligence should have discovered, the nature of her injury. However the Court noted that "discovery" does not mean actual knowledge, but rather means "knowledge of facts which would cause a reasonable person to diligently make inquiry to determine his or her legal rights." *Winters*, 149 F.3d at 403. "Under this interpretation, the tolling period may expire and the statute of limitations begin to run before a plaintiff subjectively learns the 'details of the evidence by which to establish [her] cause of action.'" *Id.* (citation omitted). The Court also noted: "The record is replete with numerous newspaper articles and excerpts from television and radio reports" about the alleged effects of Agent Orange. *Id.* The Court discounted the plaintiff's testimony about what she actually knew at the time, and found that the extensive media publicity "should have put Winters on notice." *Id.* at 404.

In this case, Plaintiffs could have discovered their alleged injuries within the two-year limitations period *as a matter of law*. *United Klans of Am. v. McGovern*, 621 F.2d 152, 154 (5th

10

Cir. 1980); *see also Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 548 (6th Cir. 2000); *Stutz Motor Car of Am., Inc. v. Reebok Int'l, Ltd.*, 909 F. Supp. 1353, 1362 (C.D. Cal. 1995). The facts surrounding the withdrawal of Redux and Pondimin from the market in September, 1997, including the extensive surrounding publicity, discussed below, put persons who had used those drugs on notice that they should consult a physician. Had Plaintiffs done so, there is no question that they would have discovered at that time any injuries they might have sustained.

## C.   THE EXTENSIVE PUBLICITY IN 1997 TRIGGERED THE STATUTE OF LIMITATIONS ON PLAINTIFFS' CLAIMS

### 1.   Publicity Following the Withdrawal in September 1997

When Pondimin and Redux were withdrawn from the market on September 15, 1997, Wyeth issued a press release stating that the company was withdrawing the drugs based on "new, preliminary information regarding heart valve abnormalities in patients using these medications."[3] The press release detailed this new information:

> On Friday afternoon, September 12, 1997, the FDA provided Wyeth-Ayerst with new summary information concerning abnormal echocardiogram findings in asymptomatic patients seen in five centers. These patients had been treated with fenfluramine or dexfenfluramine for up to 24 months, most often in combination with phentermine. Abnormal echocardiogram findings were reported in 92 of 291 subjects evaluated, including 80 reports of aortic regurgitation (mild or greater) and 23 reports of mitral regurgitation (moderate or greater).[4]

The press release advised: "Patients who have used either of these products should contact their physicians."[5]

In addition, Wyeth took out full-page advertisements in leading national and regional newspapers announcing this decision. The advertisements stated again: "Patients who have used

---

[3] Wyeth Press Release, attached as Exhibit 3.

[4] *Id.*

[5] *Id.*

either Pondimin or Redux should contact their physicians."[6]  These ads led with a banner in large

print stating, "An Important Message To Patients Who Have Used Pondimin or Redux."  The ads

informed readers of new information concerning abnormal heart valve findings in patients

without symptoms who had taken Redux or Pondimin.[7]  The advertisement provided a toll-free

number for patients to call if they had any questions.

At the same time, Wyeth also sent a "Dear Health Care Provider Letter" to approximately

450,000 doctors and pharmacists informing them of the withdrawal and the potential association

of these medications with heart valve damage.[8]  The letter stated that "patients will be advised to

contact their physicians."[9]

The FDA also issued a press release on September 15, 1997, announcing the withdrawal

of Pondimin and Redux.[10]  The FDA press release explained that the drugs were being

withdrawn based on echocardiogram findings in diet drugs users:

> These findings indicate that approximately 30 percent of patients who were
> evaluated had abnormal echocardiograms, even though they had no symptoms.
> This is a much higher than expected percentage of abnormal test results.[11]

The FDA also advised, "Users of these two products should contact their doctors to discuss their

treatment."[12]

These press releases and Wyeth's newspaper advertisements led to massive publicity.

Reports about the withdrawal of Redux and Pondimin from the market led the major network

---

[6] *An Important Message to Patients Who Have Used Pondimin or Redux*, (newspaper ad), attached as Exhibit 4.

[7] *Id.*

[8] Letter from Marc Deitch, M.D., Senior Vice President, Medial Affairs, Wyeth, to Healthcare Providers (September 15, 1997), attached as Exhibit 5; *see also* Wyeth Press Release (stating that letter was mailed to approximately 450,000 health care providers), attached as Exhibit 6.

[9] *Id.* at Exhibit 5.

[10] FDA Press Release (September 15, 1997) attached as Exhibit 7.

[11] *Id.*

[12] *Id.*

news shows on television.[13]   On September 15, 1997, Tom Brokaw began the NBC Nightly

News as follows:

> Good evening.  Two of the most popular diet drugs in America are off the market
> tonight, recalled by their manufacturers after a wave of reports that they can bring
> on heart problems.[14]

Dan Rather also led with the story:

> Good evening.  Two diet drugs used by millions of Americans have been
> withdrawn from sale nationwide.  One is fenfluramine, half the diet drug
> combination known as fen-phen for short.  It sold under the brand name
> Pondimin.  Redux is the other drug yanked from the market.  Federal health
> officials finally concluded that the two pills among other things, may indeed
> cause heart valve damage.[15]

The morning shows on September 16, 1997, also prominently featured the withdrawal of

Pondimin and Redux and the possibility they could cause heart valve damage.  Ann Curry on the

Today Show introduced an extensive story on the drugs as follows:

> A serious warning from the Food and Drug Administration.  If you are using two
> popular diet drugs, stop.  The drugs are being recalled because they could cause
> heart problems.[16]

After the news report, the Today show hosts continued to discuss the story with weatherman Al

Roker.  Roker reported that he had taken the diet drugs and lost 20 or 25 pounds.  Katie Couric

replied, "So you might want to get an echocardiogram."[17]

The CBS Morning News also prominently featured the withdrawal and the potential heart

problems.  They began their report with this introduction:

> Millions of overweight Americans are caught in a bind this morning now that the
> nation's two most popular diet drugs have been pulled from the market.  Sales of

---

[13] Wyeth is not endorsing the accuracy of any of the following news reports; it is merely documenting the extent of publicity the drugs received.

[14] *NBC Nightly News* (NBC television broadcast, September 15, 1997), transcript attached as Exhibit 8.

[15] *CBS Evening News* (CBS television broadcast, September 15, 1997), transcript attached as Exhibit 9.

[16] *Today* (NBC television broadcast September 16, 1997), transcript attached as Exhibit 10.

[17] *Id.*

13

> Redux and fenfluramine have been linked to serious heart problems and anyone
> who has been taking the drugs is urged to see a doctor.[18]

The CBS Morning News continued with an interview with the acting head of the FDA, as well as

Dr. Heidi Connolly from the Mayo Clinic, about the potential association between the drugs and

heart valve problems.[19]

The withdrawal and potential heart valve problems were covered just as extensively in

the print media.  On September 16, 1997, USA Today had a front-page story entitled "Diet

Drugs Pulled Off Market."[20]  Two follow-up articles referencing the withdrawal of Pondimin and

Redux were published in USA Today on September 22, 1997.[21]

The Washington Post also had a front-page story about the withdrawal of Redux and

Pondimin.  The headline was "2 Diet Drugs Are Pulled Off Market" and the subheading read

"Health Concerns Grow After FDA Links Pills To Rare Heart Problem."[22]

On October 8, 1997, USA Today had a story on page D1 with the headline, "Study

Supports Diet Drug Recall."[23]  The subheading of the article was "Early data turn up heart-valve

defects."[24]  The article stated that after Redux and Pondimin were pulled from the market,

preliminary evidence suggested that the two drugs are "likely responsible for heart-valve

defects."[25] Another article in USA Today a month later provided more information about

possible heart valve problems.  The headline was "Study Supports Halting Sales of Two Diet

---

[18] *CBS Morning News* (CBS television broadcast, September 16, 1997), transcript attached as Exhibit 11.

[19] *Id.*

[20] Nanci Hellmich and Steve Sternberg, *Diet Drugs Pulled Off Market*, USA Today, September 16, 1997 at 1A, attached as Exhibit 12.

[21] *Withdrawal of Drugs Leaves Dieters in Quandary,* USA Today, September 22, 1997; *Other Combinations Draw Interest*, USA Today, September 22, 1997, attached as Exhibit 13.

[22] John Schwartz, *2 Diet Drugs Are Pulled Off Market*, Washington Post, September 16, 1996, at A1, attached as Exhibit 14.

[23] Nanci Hellmich, *Study Supports Diet Drug Recall*, USA Today, October 8, 1997 at D1, attached as Exhibit 15.

[24] *Id.*

[25] *Id.*

Drugs," and it claimed that "[n]ew evidence from a government-funded study indicates that 25% of patients who took popular diet drugs developed heart-valve problems."[26]

> **2.     The U.S. Government Warning in November 1997 that Former Users Should Consult their Doctors**

Any former users of Pondimin or Redux who had not already been put on at least inquiry notice in September 1997, were then subject to further publicity in November of that year.  On November 14, 1997, the United States Department of Health and Human Services published health recommendations for former users of Pondimin and Redux.  That agency recommended that all former users of diet drugs should see their physicians.[27]  This recommendation led to another massive wave of publicity.

On November 13, 1997, Tom Brokaw reported on the new recommendations for diet drug users on the NBC Nightly News:

> Another warning tonight for the millions of Americans who took the diet drugs phen-fen.  The government is urging all of them to see their doctors, even if they feel fine.  The drugs were pulled off the market in September after they were shown to cause serious heart problems.  The experts say the dieters should be checked for any heart or lung problems.[28]

CBS broadcast a similar report, in which Dan Rather said:

> Also tonight, a government warning to millions of users of the diet drug combination known as fen-phen for short.  The government says anyone who used fen-phen, or even one of the two drugs, should be checked for possible heart or lung damage.[29]

ABC carried the story the next day.  The network's World News Now began:

---

[26] Nanci Hellmich, *Study Supports Halting Sales of Two Diet Drug*, USA Today, November 12, 1997 at 20A, attached as Exhibit 16.

[27] "Cardiac Valvulopathy Associated with Exposure to Fenfluramine or Dexfenfluramine: U.S. Department of Health and Human Services Interim Public Health Recommendations, November 1997" (MMWR, November 14, 1997; 46, 45: 1061-66), attached as Exhibit 17.

[28] *NBC Nightly News* (NBC television broadcast, November 13, 1997), transcript attached as Exhibit 18.

[29] *CBS Evening News* (CBS television broadcast, November 13, 1997), transcript attached as Exhibit 19.

> If you are a dieter who has tried fen-phen or Redux, there are new reasons to get to a doctor. The government has intensified its warnings about the potential effects of the drug, even for those who are now feeling fine.[30]

Good Morning America had a similar story.[31] CNN also reported that "If you've taken the diet drugs phen-fen or Redux, health officials say you better see your doctor."[32] During this news segment, Dr. Michael Friedman, acting commissioner of the FDA, said, "We know that—that some individuals who have taken these diet medications have-have heart valves that are thick and don't function properly."[33] Also on CNN, on the same day, Joie Chen, co-anchor, said:

> The government is warning anyone who used the diet drugs fen-phen or Redux for any amount of time to see a doctor and get a physical exam, even if you feel fine. This comes two months after the popular diet pills were pulled from the market, due to suspected links with potentially deadly heart valve damage.[34]

CNN Headline News also reported the government's recommendations:

> If you are one of the millions of Americans who turned to Phen/Fen or Redux to lose weight, it is time to make an appointment with your doctor. In September, both prescription drugs were pulled from the market because the key ingredient was linked to heart valve damage. Today the government began recommending that former users should have their hearts examined. They should get an echocardiogram if symptoms are found. They should use antibiotics before surgery or dental work if they have valve damage.[35]

CNN also carried the story multiple times on November 14, 1997.[36]

The Washington Post published an article on the recommendations on November 14, 1997. The article, titled "Fenfluramine, Redux Dieters Are Urged to See Physicians," stated,

---

[30] World News Now (ABC television broadcast, November 14, 1997), transcript attached as Exhibit 20.

[31] Good Morning America (ABC television broadcast, November 14, 1997), transcript attached as Exhibit 21.

[32] Early Prime (CNN television broadcast, November 13, 1997), transcript attached as Exhibit 22.

[33] Id.

[34] The World Today (CNN television broadcast, November 13, 1997), transcript attached as Exhibit 23.

[35] Headline News (CNN Headline News television broadcast, November 13, 1997), transcript attached as Exhibit 24.

[36] See, CNN Headline News (CNN Headline News television broadcast, November 14, 1997), transcript attached as Exhibit 25.

"[a]nyone who has ever used the two recently recalled diet drugs for any length of time should see a physician and get a physical examination, the government said yesterday."[37]

### 3.    Further Publicity in mid-1999

Not only were Plaintiffs placed on at least inquiry notice as early as the fall of 1997, but in mid-1999, there was further publicity about the possibility of an injury related to Pondimin or Redux sufficient to warn Plaintiff to seek the advice of a physician.  In August 1999, over three years before the filing of the instant action, a jury in Van Zandt County, Texas, awarded plaintiff Debbie Lovett over $23 million in damages for injuries allegedly caused by her ingestion of Pondimin.  This verdict was extensively reported by the media.  On August 6, 1999, CNN covered the Lovett verdict, including in its coverage the fact that the Lovett case was "the first of thirty-one hundred pending fen-phen cases."[38]  The CBS Evening News with Dan Rather also ran a story on the Lovett verdict, explaining not only the association between Pondimin and heart valve damage, but also noting the withdrawal of the drug in 1997 and the verdict's effect on the thousands of other women who have taken the drug.[39]

### 4.    The Extensive Information Publicized in Late 1999 through March 2000 Relating to a Nationwide Class Action Settlement

Less than two months later, another wave of massive publicity brought to the nation's attention, and did or should have brought to Plaintiffs' attention, the possibility of heart valve injury associated with the use of diet drugs.  The Nationwide Class Action Settlement (the "Settlement") between Wyeth and users of Pondimin and/or Redux was tentatively approved by the MDL Court, Judge Louis C. Bechtle presiding.  In that Settlement, Wyeth agreed to pay

---

[37] Associated Press, *Fenfluramine, Redux Dieters Are Urged to See Physicians*, Washington Post, November 14, 1997 at A24, attached as Exhibit 26.

[38] *CNN Headline News Second Watch* (CNN Headline News television broadcast, August 6, 1999), transcript attached as Exhibit 27; *CNN Headline News* (CNN Headline News television broadcast, August 6, 1999), transcript attached as Exhibit 28.

[39] *CBS Evening News* (CBS television broadcast, August 6, 1999), transcript attached as Exhibit 29. *See also NBC Nightly News* (NBC television broadcast, August 6, 1999), transcript attached as Exhibit 30.

17

$3.75 billion—a virtually unprecedented sum. Not only was the Settlement highly publicized in the local and national media, but an "elaborate and extensive plan of notice" was employed to ensure that notice would reach as many of those affected by the settlement as possible, as Judge Bechtle explained in his subsequent opinion approving the Settlement as fair, reasonable and adequate.[40] The elaborate notice program approved by Judge Bechtle included a campaign – in November 1999 and extending into January and February, 2000 – "employ[ing] sophisticated media techniques designed to reach all class members."[41] That campaign used television messages that were broadcast 106 times over a period of five weeks on network television, and were broadcast 781 times for six consecutive weeks on various cable networks.[42] The text of the television message was as follows:

> If you took the diet drug combination known as FenPhen or the diet drugs Pondimin or Redux, you may have heart valve problems and not know it. As a result of the proposed class action settlement, you could be eligible for free medical testing and compensation. But you must act promptly. You must decide whether to participate in this settlement by March 30, 2000. If you do nothing, your legal rights will be affected. Call 1-800-386-2070 today.[43]

A summary notice was also published in the print media.[44] This notice appeared repeatedly in several magazines, including *Parade*, *People*, *Time*, *Ladies Home Journal*, *Redbook*, and *Good Housekeeping*.[45] Banner ads were also developed for use on the Internet.[46] That notice was also published in national and local newspapers and in a variety of publications

---

[40] *See* 2000 WL 1222042, at *35. The Settlement was first announced when a Memorandum of Understanding was signed in October 1999. The final agreement was signed November 18, 1999 and tentatively approved by Judge Bechtle on November 23, 1999. *Id.* at *5.

[41] *Id.* at *35.

[42] *See id.*

[43] *See id.* at n.11.

[44] *See id.*; *see also* Official Court Notice: Attention Anyone Who Took "Fen-Phen," Pondimin and/or Redux, attached as Exhibit 31.

[45] *See* 2000 WL 1222042, at *35 & n.12.

[46] *See id.* at *35.

targeted to healthcare providers and pharmacists.[47]   In addition, notice was mailed to all pharmacists and doctors who are likely to have prescribed Pondimin or Redux or treated patients for complications resulting from their use.   That package included, among other things, a "counter card" which pharmacists and physicians could display to alert patients about the existence of the Settlement, with a toll-free number and website to contact for further information.[48]

As MDL Judge Bechtle found in Pretrial Order No. 1415, "[t]he media program . . . was highly successful," in part because it was "greatly enhanced by the enormous publicity that has surrounded the diet drugs involved in this litigation and the publicity of this Settlement."[49]   In fact, according to a media analysis, 97% of women between the ages of 25 and 54 viewed one or more forms of televised or printed notice an average of ten (10) times.   Almost 80% of women in the same age group were exposed to the televised or printed notice a minimum of five (5) times.[50]

**5.     Any Injuries Sustained by Plaintiffs Could Have Been Determined after Plaintiff Stopped Using these Diet Drugs, at least by September 1997.**

Because of this massive publicity, Plaintiff was on at least inquiry notice by the fall of 1997 that they might have an injury related to Pondimin or Redux.   Had they inquired at that time, had they heeded the advice of Wyeth, the U.S. Government, numerous plaintiffs' attorneys and the national press, they would have consulted a physician and would have discovered any injury.   Heart valve injuries related to the use of Pondimin or Redux are not "latent."[51]   In other

---

[47] *Id.* at **35-36.

[48] *Id.* at *36.

[49] *Id.*

[50] *Id.* at *36 n.16.

[51] Memorandum and Pretrial Order No. 2886 entered June 12, 2003, in *In Re: Diet Drugs*, MDL Docket No. 1203, p. 7, attached as Exhibit A.

words, persons who have heart valve injury associated with the use of diet drugs first experience

that injury, at the latest, shortly after their use of the drugs, not after the passage of several years.

This is the finding made by Judge Bechtle in connection with his approval of the Settlement. *See*

*Brown v. American Home Products Corporation, In re:  Diet Drugs (Phentermine,*

*Fenfluramine, Dexfenfluramine) Products Liability,* 2000 WL 1222042 at *18.  That finding was

made after an adversarial hearing at which the available medical evidence was argued on both

sides of this issue.[52]  Indeed, in approving the Settlement over the objection of some Class

Members, the Court noted that, in the absence of the Settlement, Wyeth had a viable statute of

limitations defense against many claims, precisely because the injuries at issue are not "latent:"

> Pondimin and Redux were withdrawn from the market in September 1997
> accompanied by an unprecedented amount of publicity which effectively warned
> diet drug users that they may have developed valvular lesions which could be
> detected through non-invasive echocardiograms.  *Also, these lesions are not
> latent.  If they are going to occur, they are going to occur during drug use (or
> shortly thereafter) and be demonstrable on echocardiogram.*

*Id.* (emphasis added).

Moreover, in distinguishing the diet drug settlement from the problematic settlement

addressed in *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 628 (1997), the MDL Court

found that diet drug users had notice of the risks of injury from the diet drugs when Wyeth

withdrew them from the market in 1997.  2000 WL 1222042 at *39.  The MDL Court further

contrasted the evidence in *Amchem* from the diet drug Settlement, explaining:

> The instant class does not suffer from the same problems that exposure-
> only class members suffered from in *Amchem.*  In *Amchem,* the Court found that
> class members could not fairly be bound by a settlement where some members
> were unaware of their exposure to asbestos or where their potential injuries could
> have a latency period of 30 to 40 years. Here, all class members are aware of their
> exposure to Pondimin or Redux, which have been off the market since September
> 1997. *In addition, the class members have a diagnosable condition that can be
> detected through an echocardiogram.*

---

[52] *See generally* 2000 WL 1222042.

> Objectors argue that a "futures" problem similar to that in *Amchem* exists here because issues regarding the latency and progression of VHD remain vague. The clinical and epidemiological studies demonstrate--and all the experts agree--that insofar as the use of fenfluramine or dexfenfluramine results in an increased prevalence of valvular regurgitation, that regurgitation is detectable by echocardiogram shortly after the patients discontinue use of diet drugs. Conversely, there is no evidence that the use of the drugs results in any increased risk of regurgitation that is "latent" and not detectable by today's sophisticated echocardiographic technology.

2000 WL 1222042 at *46 (emphasis added).

Judge Bartle recently reiterated Judge Bechtle's findings on latency in denying the plaintiff's motion to remand in an Alabama case. Judge Bartle stated, "Since there is no latency period between ingestion of Pondimin and any injury, plaintiff's injury at the latest commenced, and thus the limitations period began to run, shortly after Pondimin went off the market in late 1997."[53] In reaching this result Judge Bartle relied upon Judge Bechtle's order approving the settlement in which he determined that a number of studies confirmed "'that there was no emergence of new disease after some latency period.'" *Id.* (quoting PTO 1415 at 46).

### 6.   Plaintiffs are Collaterally Estopped from Asserting that Diet Drug Induced Heart Valve Regurgitation is a Latent Injury.

Plaintiff, as a Class Member of the Settlement, is bound by the doctrine of collateral estoppel to accept the findings of the MDL Court, including the finding that diet drug related heart valve injuries are not latent. *See Mower v. Boyer,* 811 S.W.2d 560, 563 (Tex. 1991). Counsel for Wyeth and Class Counsel for the class members presented evidence and arguments at an MDL Fairness Hearing on the question of whether there is a significant latency period between the discontinuation of diet drug use and the onset of valve injury—and thus a "futures" problem. The MDL Court fully considered, and the parties, including Objectors to the Settlement, actually and fully litigated, this issue. Moreover, the MDL Court's decision that

---

[53] Memorandum and Pretrial Order No. 2886 entered June 12, 2003, in *In Re: Diet Drugs*, MDL Docket No. 1203, p. 7, attached as Exhibit A. (footnote omitted).

21

there was no evidence to support the existence of a latency period was essential to the judgment. As noted above, if diet drug injuries were latent, then the Settlement might have violated the Supreme Court's holding in *Amchem* disallowing class action injury settlements that have a "futures" problem based on the latent development of injury after exposure. Accordingly, the MDL Court's finding of fact that there is no such "futures" problem, was an essential and necessary finding that allowed the Court to approve the Settlement.

The issue having been litigated, decided and made an essential finding of the judgment approving the Settlement, the doctrine of collateral estoppel precludes Plaintiffs from relitigating that issue.[54] Indeed, other courts have concluded that issues litigated at a class action fairness hearing that are essential to the approval of a settlement cannot be relitigated in a subsequent proceeding.[55]

Texas courts have consistently applied the doctrine of collateral estoppel to preclude relitigation of issues. Under Texas law, collateral estoppel applies when:

> (1) the facts sought to be litigated in the first action were fully and fairly litigated in the prior action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action.

*Mower*, 811 S.W. 2d at 563 (citations omitted). Here, as discussed above, the latency issue was actually litigated, was essential to the judgment approving the class settlement, and Wyeth (as a proponent of the settlement) and Plaintiffs (through the objectors) were "cast as adversaries." Therefore, Plaintiffs are collaterally estopped from relitigating the issue of latency here. *Id.*

---

[54] *See, e.g.,* Restatement (Second) of Judgments, § 27 (recognizing party is collaterally estopped from re-litigating question of fact when identical issue has been actually litigated, submitted for determination and necessarily decided); *id.* § 41(1) ("A person who is not a party to an action but who is represented by a party is bound by and entitled to judgment as though he was a party. A person represented by a party who is: . . . (e) The representative of a class of persons similarly situated, designated as such with the approval of the court, of which the person is a member.").

[55] *See, e.g., Golden v. Pacific Maritime Ass'n*, 786 F.2d 1425, 1428 (9th Cir. 1986) (holding that class member's suit against class counsel barred by class action court's implicit finding of adequacy of representation); *Laskey v. Int'l Union, United Auto., Aero & Agric. Implement Workers of Am.*, 638 F.2d 954, 956 (6th Cir. 1981) (same, noting adequacy of representation "essential to approving the [class] settlement"); *Thomas v. Albright*, 77 F. Supp. 2d 114 (D.D.C. 1999), *aff'd*, 247 F.3d 260 (D.C. Cir.), *cert. denied*, 534 U.S. 951, 122 S. Ct. 347 (2001) (same).

22

7. **Other Federal Courts Have Determined that the Widespread Media Coverage of the Withdrawal of the Diet Drugs and Ensuing Litigation was Sufficient to Put Plaintiffs on Notice of their Claims.**

Significantly, other federal courts have agreed that the widespread publicity surrounding the withdrawal of diet drugs was sufficient to impute knowledge to diet drug plaintiffs about their claims against health care providers as a matter of law. In the most recent decision by a Texas federal district court, the United States District Court for the Western District of Texas, Austin Division, denied the plaintiff's motion to remand in a case that was substantially identical to the current case. Judge Sam Sparks held that the plaintiff had "no possibility of succeeding in her claims against [the prescribing physician] in state court." *McCurdy v. Wyeth*, Cause No. A-03-CA-054-SS, February 14, 2003 at 8, attached as Exhibit 32.

> Plaintiffs are charged with knowledge of facts made public through the media. *Wyeth's evidence indicates a reasonably diligent plaintiff should have learned facts about the risks to fen-phen users of heart valve problems, as well as facts about the lack of noticeable symptoms of such problems, long before December 31, 2000* (two years before McCurdy filed her lawsuit).

*Id.* at 6-7 (emphasis added).

Similarly, the United States District Court for the Western District of Oklahoma has found that diet drug plaintiffs' claims are barred against physicians due to the statute of limitations because the widespread media coverage of the diet drugs was sufficient to put plaintiffs on notice of their claims. *See Moseley v. Wyeth*, Cause No. CIV-2-1120-M, September 13, 2002, at 5, attached as Exhibit 33 ("[T]he Court finds the widespread media coverage surrounding the Phen-Fen diet drugs from September 1997 through February 2000 is more than sufficient to impute knowledge to plaintiff about her claims against [her prescriber]."); *see also* Order denying motion for reconsideration, attached as Exhibit 34; *McKee v. Wyeth*, Cause No. CIV-2-1119-C, October 1, 2002, at 1-2, attached as Exhibit 35 (adopting *Moseley* reasoning in concluding claims against prescribing physicians are barred by limitations); *Stafford v. Wyeth*,

Cause No. CIV-2-1118-L, September 18, 2002, at 6, attached as Exhibit 36 (noting "massive publicity surrounding Pondimin and Phen-fen" in holding claims against prescribing physician barred by limitations); *Harting v. Wyeth, Inc., et al.*, Cause No. CIV-03-379-F, April 23, 2003, attached as Exhibit 37 (adopting *Moseley*, *Stafford* and *McKee* reasoning in concluding claims against prescribing physicians are barred by limitations). The Eastern District of Oklahoma has adopted the same reasoning. *See Haggard v. Wyeth*, Cause No. CIV-02-446-S, October, 8, 2002, at 1-2, attached as Exhibit 38 ("This court finds that given the extensive and widespread media coverage surrounding Phen-Fen diet drugs, Plaintiff had constructive knowledge of her claims against Dr. Jackson more than two years prior" to filing suit.). While some Texas federal district courts have reached a different result on this issue, *e.g.*, *Blasingame v. Wyeth*, Cause No. CIV-1:02-CV-745, (E.D. Tex. Jan. 7, 2003), Wyeth submits that the better-reasoned approach is reflected in these attached orders.

In addition, Judge Harvey Bartle recently entered an order approving amendments to the Nationwide Class Action Settlement. In that order, he found that:

> [t]here has been an unprecedented amount of notice associated with the fen-phen class action settlement such that these class members cannot legitimately assert that they were unaware of the dangers that the diet drug posed.[56]

Recently, the United States District Court for the Middle District of Tennessee, Nashville Division, found that the official court notice of the settlement received by the plaintiff in that case put her on notice of possible injury from Fen-Phen use, thereby commencing the statute of limitations. *Constant v. Wyeth, et al.*, Cause No. 3:03-0052, April 9, 2003, at 7, attached as Exhibit 1. The district court further determined that by waiting an additional year and nine months to have medical testing done after receiving the official court notice of the settlement, the plaintiff did not exercise reasonable care and diligence to discover her injury. *Id.*

---

[56] Memorandum and Pretrial Order No. 2677 entered December 10, 2002 in *In Re: Diet Drugs*, MDL Docket No. 1203, p. 13, attached as Exhibit 39.

In short, this is not a case in which an injury may develop years after exposure to the allegedly toxic substance.  It is, rather, a case in which the alleged injury had already occurred, if at all, shortly after Plaintiff had stopped taking the diet drugs.  The statute of limitations on Plaintiffs' claims against Drs. Jubang, Hale and Cole started running no later than September 1997.  Plaintiff unquestionably knew that they had ingested diet drugs.  Because of the withdrawal of the diet drugs from the market on September 15, 1997, and the accompanying massive publicity, as well as the publicity relating to the U.S. Government's warning that former users of these diet drugs should obtain an echocardiogram, Plaintiffs knew or should have known by the fall of 1997 of possible heart valve regurgitation associated with the ingestion of diet drugs.  The information triggering that notice was repeated again and again, not only in the fall of 1997, but throughout the diet drug litigation.  Most prominently, the publicity surrounding the *Lovett* verdict in August 1999, and the publicity and notice campaign relating to the Settlement from October 1999, through at least February 2000, cannot have failed to have put any reasonable person on notice.

Accordingly, there is no reasonable possibility at this time that Plaintiffs could overcome a statute of limitations defense by Drs. Jubang, Hale and Cole, and thus they are fraudulently joined.

## D.   THE JOINDER OF THE CLAIMS OF MULTIPLE PLAINTIFFS IN ONE PETITION IS AN EGREGIOUS MISJOINDER

Even if the Court should conclude that only some of these plaintiffs have fraudulently joined their prescribing physicians, it should retain jurisdiction over these plaintiffs' claims rather than remand the entire case to state court.  Diversity jurisdiction cannot be defeated by an egregious misjoinder of claims. *In re Benjamin Moore & Co.*, 309 F.3d 296, 298 (5th Cir. 2002) (identifying possible misjoinder of plaintiffs as "feature critical to jurisdictional analysis"); *see*

also *Tapscott v. MS Dealer Serv. Corp.*, 77 F.3d 1353, 1360 (11th Cir. 1996) ("Misjoinder may be just as fraudulent as the joinder of a resident defendant against whom a plaintiff has no possibility of a cause of action."), *abrogated on other grounds*, *Cohen v. Office Depot, Inc.*, 204 F.3d 1069 (11th Cir. 2000); *Coleman v. Conseco, Inc.*, 238 F.Supp.2d 804, 817-18 (S.D. Miss. 2002) (denying motion to remand of otherwise diverse plaintiffs on ground that their claims had been fraudulently misjoined with claims of non-diverse plaintiffs).

The joinder of the claims of these multiple plaintiffs in one petition is an egregious misjoinder because the claims do not arise out of "the same transaction, occurrence, or series of transactions or occurrences." TEX. R. CIV. P. 40(a); FED. R. CIV. P. 20(a). Indeed, the MDL Court in the diet drug litigation has expressly held that individual plaintiffs' "purchases and ingestion of diet drugs" do not constitute "a series of transactions or occurrences which satisfy Rule 20(a)," at least when the plaintiffs did not obtain the diet drugs from the same source. *In re: Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig.*, 1999 WL 554584 at *4 (E.D. Pa. July 16, 1999). There is no reason to believe that the multiple plaintiffs here obtained their diet drugs from the same source. Certainly, there is no allegation that they did so. Nor do these claims appear to have anything else in common other than the bare allegation that each of the plaintiffs ingested one of the diet drugs. The bundling of these claims in one petition was an egregious misjoinder of claims, and the Court should therefore retain jurisdiction over the claims of each plaintiff whom it finds has fraudulently joined his or her prescribing physician.

**E.   PLAINTIFFS' FRAUDULENT JOINDER OF A NONDIVERSE DEFENDANT IS PART OF A LARGER PATTERN OF ATTEMPTS WRONGFULLY TO PREVENT WYETH FROM EXERCISING ITS REMOVAL RIGHTS**

The history of the diet drug litigation has demonstrated that plaintiffs' counsel will go to extreme lengths to keep their cases out of federal court—and particularly far away from the

26

MDL Court overseeing the nationwide Settlement in the Eastern District of Pennsylvania, the Court most familiar with the complex medical and legal issues presented by the diet drug litigation. Among only a few of the many examples:

- Some plaintiffs' lawyers have sued local doctors who prescribed the diet drugs in order to block diversity jurisdiction, while telling the doctors behind the scenes that the plaintiff really has no intention of pursuing them.[57]

- Some plaintiffs' lawyers have sued local doctors who did not even treat plaintiffs.[58]

- Some plaintiffs' lawyers have sued local pharmacies with no intention of pursuing a judgment against them.[59]

- Some plaintiffs' lawyers have made deals with some diverse defendants not to pursue them if they refuse to consent to Wyeth's removal efforts.[60]

In one case, the plaintiff named as a physician defendant an individual who was not even a licensed physician in the State of Texas and who had never practiced medicine. *See* Original Answer of Defendant, Imdad Jatoi, attached as Exhibit 49. Plaintiff here is following in these footsteps by suing a physician against whom Plaintiff's claims are plainly time-barred.

### III.

### Co-Defendant's Consent To Removal

---

[57] *See* Short Dep. at 73 (deposition of doctor-defendant in Idaho case testifying plaintiff had called him when suit was filed and said "not to worry about it," because "as soon as they got the thing settled so they would stay in the state of Idaho, or something, that we'd be dropped"), attached as Exhibit 40; Ditta Dep. at 31 (deposition of doctor-defendant in Louisiana case testifying plaintiffs' counsel told her she need not even retain a lawyer, because she was not the target), attached as Exhibit 41. *See also* Order Denying Motion to Remand, *Heimback v. A.H. Robins, et al.* CV 02-0347-S-BLW (finding that Dr. Short and Dr. Parra were fraudulently joined), attached as Exhibit 42; *Wakefield v. American Home Prods. Corp.*, CV 02-20164; MDL 1203 PTO 2687 (denying remand and finding "it is clear the plaintiff had no intention of pursuing this action against Dr. Reyes."), attached as Exhibit 43.

[58] *See* Hersh Aff. ¶ 5 (affidavit of Louisiana doctor sued by 145 plaintiffs, despite fact that he could identify only one as former patient, attached as Exhibit 44; MDL 1203 PTO 2567 at 12-13, attached as Exhibit 45.

[59] *See* Exhibit 46 (Congressional testimony of a pharmacist sued repeatedly, but ultimately always dismissed); Exhibit 45 at 16-17.

[60] *See* Fishbein Decl. ¶ 5 (affidavit testifying to statements of one national defense counsel admitting to that effect), attached as Exhibit 47; Huffer Aff. ¶ 14 & Attachment (affidavit reporting voicemail message by another defense counsel refusing to consent in light of such agreement), attached as Exhibit 48; *see also* Exhibit 45 at 10.

The consent of Drs. Jubang, Hale and Cole is not necessary since Drs. Jubang, Hale and Cole are fraudulently joined. *Jernigan v. Ashland Oil, Inc.*, 989 F.2d 812, 815 (5th Cir.), cert. denied, 510 U.S. 868 (1993).

## IV.

### Amount in Controversy

Plaintiff's own Petition establishes on its face that the amount in controversy in this diet drug case exceeds $75,000, exclusive of interest and costs. Plaintiff alleges that she has suffered severe injuries to her heart valves, and she seeks damages for past and future medical expenses; past and future physical pain and mental anguish; past and future disfigurement and physical impairment; loss of earnings in the past; loss of earning capacity in the future; loss of enjoyment of life and diminished physical abilities; worry and anxiety; and all hedonic damages allowed by law. Petition, ¶ 80.

## V.

### Timeliness

This Notice of Removal is timely filed in accordance with 28 U.S.C. § 1446(b) because it is filed within thirty days of September 8, 2003 the date Wyeth received the petition.

## VI.

### Conclusion

Upon filing of this notice of the removal of this cause, written notice of the filing is being given by Defendant to Plaintiffs and their counsel as required by law. A copy of the notice with proof of service of it is attached hereto. A copy of this notice is also being filed with the Clerk of the county court at law in which this cause was originally filed.

WHEREFORE, Wyeth prays that the above-styled action pending against it in the 192nd Judicial District Court of Dallas County, Texas, be removed to this Honorable Court.

Respectfully submitted,

**CLARK, THOMAS & WINTERS,**
**A PROFESSIONAL CORPORATION**
P.O. Box 1148
Austin, Texas  78767
(512) 472-8800
(512) 474-1129 [Fax]


By: _____
Kenneth J. Ferguson
Attorney in Charge
State Bar No. 06918100


**OF COUNSEL:**

**CLARK, THOMAS & WINTERS**
**A PROFESSIONAL CORPORATION**
Leslie A. Benitez
State Bar No. 02134300
Susan E. Burnett
State Bar No. 20648050
David Lill
State Bar No. 12352500
P.O. Box 1148
Austin, Texas  78767
(512) 472-8800
(512) 474-1129 [Fax]

And

**VINSON & ELKINS, L.L.P.**
William D. Sims, Jr.
State Bar No. 18429500
Dale Markland
State Bar No. 12988500
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201-2975
(214) 220-7700
(214) 220-7716 [Fax]

**COUNSEL FOR DEFENDANT WYETH**

29

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was forwarded in the manner described below to the following interested parties on this 29 day of Sept, 2003.

***Via Certified Mail/Return Receipt Requested***
George M. Fleming
Scott A. Love
Fleming & Associates, L.L.P.
1330 Post Oak Blvd., Suite 3030
Houston, Texas 77056

Mike O'Brien
Mike O'Brien, P.C.
1330 Post Oak Blvd., Suite 2960
Houston, Texas 77056
**Attorneys for Plaintiff**